NOTICE
Decision filed 02/01/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 170135-U

NO. 5-17-0135

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 11-CF-76 |
| | ) | |
| DARNELL NORTHINGTON, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: Postconviction counsel did not fail to comply with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) and provided reasonable assistance throughout the defendant's second-stage postconviction proceedings.

¶ 2    The defendant, Darnell Northington, appeals from the denial of his postconviction petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)).  For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4                    A. The Defendant's Jury Trial and Direct Appeal

¶ 5     On January 28, 2011, the defendant was charged by indictment with one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)). It was alleged that the defendant, "without lawful justification and with the intent to kill or do great bodily harm to Ramone Cole, shot Ramone Cole in the back of the head and posterior torso with a gun, thereby causing the death of Ramone Cole." The State subsequently filed a notice of intent to seek a mandatory 25-year sentencing enhancement based on the fact that the defendant personally discharged a firearm causing the death of an individual (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010)).

¶ 6     On September 12, 2012, the defendant's five-day jury trial commenced. Judge Michael N. Cook presided over the defendant's trial, with Assistant State's Attorneys (ASAs) Joseph Christ and Judith Dalan representing the State.

¶ 7     Jeffrey Fields, a former police officer with the Centreville Police Department, testified that around 10:30 p.m. on January 7, 2011, he was dispatched to 82nd and Bellevue Avenue on a call of multiple shots fired. When he arrived, Fields spoke to Sergeant Wright, who had arrived first, and they determined there was no evidence of a crime. Fields was driving back to his regular patrol area on the other side of town when Detective Tomlinson ordered him to check the perimeter of the victim's home. Fields and Wright arrived at 7906 Bellevue Avenue around 10:50 p.m., and Tomlinson met them there. They walked around the house; Wright told Fields she checked the front and back doors, and they were locked. Having found no evidence of a crime, Fields and Wright

headed to the police station to complete end-of-shift reports. At the station, Wright got a call from Detective Ward with the East St. Louis Police Department, who received an anonymous tip about a deceased individual inside the house. Fields, Wright, Ward, and Tomlinson returned to the victim's house at midnight, entered it through the unlocked back door, and found the victim's body face down on the hallway floor. The victim had no vital signs, and he appeared to have a gunshot wound to the back and one or two gunshot wounds to the back of the head.

¶ 8    Illinois State Police (ISP) crime scene investigator (CSI) Abigail Keller testified that she found two discharged 9-millimeter Luger cartridge casings in the living room and three discharged .45-caliber Winchester cartridge casings in the hallway. The last two .45-caliber casings were right together at the threshold of the bathroom near where the victim's head had been lying when he was discovered. She also found three projectiles in the house, including projectile number one (a 9-millimeter) in a spindled partition between the "rear entry room" and the hallway, projectile number two (a 9-millimeter) in "the west wall of the rear entry room," and projectile number three (a .45-caliber) burrowed into the hallway floor near where the victim's body had been discovered.

¶ 9    Dr. Raj Nanduri testified that she performed the autopsy on the victim. The victim had been shot four times prior to his death. One bullet traveled through his left palm and out the back of his hand; this was a defensive wound. A second shot went through the left side of the victim's chest, with the bullet exiting his neck. A third shot entered the victim's back and exited his stomach; this was a contact wound. This was a fatal wound, although the victim would not have died instantly from it. A fourth shot entered the back of the

3

victim's head and lodged in his neck, where a fired .45-caliber bullet was recovered during the autopsy. This shot would have been instantly fatal.

¶ 10 Defense counsel elicited Dr. Nanduri's testimony that the death certificate worksheet listed the victim's date and time of injury as 10:08 p.m. on January 7, 2011. It listed his date and time of death as 12:42 a.m. on January 8, 2011, but Dr. Nanduri explained that this only reflected the time that the victim was pronounced dead. She did not know when he died. The coroner filled out the death certificate, and Dr. Nanduri had never seen it before. The worksheet listed the "cause of death" as "[g]unshot wound to the head and abdomen" and the "approximate interval between onset and death" as "sudden." She explained that by "sudden," the coroner was saying that the victim would have died soon after injury, and that the coroner needed to fill in the blanks on the worksheet or else it would be sent back. She said she did not know the order in which the victim sustained the gunshots or whether time passed between the nonfatal and fatal shots. Therefore, she partially disagreed with the notation that the victim died suddenly.

¶ 11 ISP CSI Sergeant Mike Lewis testified that he attended the autopsy Dr. Nanduri performed on the victim to take photographs and collect evidence. Lewis collected two fired projectiles from the autopsy—one from the victim's neck and one from the back-right side of the sweatshirt hood. People's Exhibit 66-1 was the sweatshirt bullet, and People's Exhibit 66-2 was the neck bullet.

¶ 12 A firearms examiner testified that the two 9-millimeter cartridge casings recovered from the victim's living room were fired from the same gun and the three .45-caliber casings found in the hallway were fired from the same gun. The two 9-millimeter bullets

recovered from the house were fired from the same gun as Exhibit 66-1, the 9-millimeter bullet found in the victim's sweatshirt hood. People's Exhibit 66-2, the bullet recovered from the victim's neck, was fired from the same .45-caliber gun that fired the .45-caliber bullet found in the hallway floor at the scene. According to the firearms examiner's calculations, one .45-caliber bullet and one 9-millimeter cartridge case were missing. The firearms examiner acknowledged that the missing bullet could have been inside another person if that person had been shot.

¶ 13 After the shooting, police officers interviewed the victim's friends and family. Former O'Fallon police detective Kirk Brueggeman and Marissa police investigator Mike Delong interviewed the defendant on January 9, 2011, at the Centreville police station. Prior to that date, the defendant had been identified as the victim's friend, and his name was on the victim's lease and utility bills. Brueggeman identified People's Exhibit 70-1, 70-2, and 70-3 as the videos of that interrogation, and they were admitted and published without objection, having been redacted previously by agreement.

¶ 14 On the videos, the defendant told the officers that the victim would procure cannabis and give it to several people to sell, then he would collect money from them. Those involved in distributing the cannabis were a tight-knit circle of associates who called themselves "family" or "fam." The defendant indicated that he was the victim's best friend and said he wanted to find out who killed the victim. The defendant's name was on the victim's lease and bills to keep the victim off the radar. The defendant and his brother were very close to the victim, and they were also formerly close to the victim's nephew,

5

Tremont Davis; however, Tremont got very into church and moved away from drugs, so he was not as close to the group as he had been previously.

¶ 15    The defendant said that his brother was an artist on the victim's record label, and on January 7, 2011, the defendant and his brother were at the recording studio from around 11 a.m. to 3 p.m.   His brother then went to the victim's house to talk about normal stuff, including his music.  The defendant went for drinks at the Casino Queen, then around 8 p.m., he went to his mother's house in Cahokia for a while.

¶ 16    Tremont came by the defendant's mother's house, which the defendant found suspicious.  Tremont had heard from someone who told him that the victim's girlfriend told them that the victim had been shot; Tremont's mother, Cassandra Davis, also said she heard that the victim had been shot.  The defendant said that the victim was a "G.D.," which at that time represented the street organization "Growth & Development" but previously stood for "Gangster Disciples."

¶ 17    The defendant said that the victim had a .40-caliber handgun that was not registered to him since he was a felon.  A man named "Smooth"[1] also had a weapon, was a G.D., and hung out with the victim.  The defendant was sure that his brothers, Tremont, Patrick Davis, and Pierre were not involved in the victim's murder.  He repeatedly intimated that he or others might know who shot the victim and might cooperate with police, or they might take care of the murderer on their own, but he denied any involvement.  In this statement, the

---

[1]In his first interview, the defendant refused to tell officers Smooth's real name.  In his second interview, he acknowledged that Smooth also went by the nickname of "Slick."  However, at trial, Brueggeman and the defendant testified that "Smooth" or "Slick" referred to Damien Jenkins.

defendant never said that he shot the victim, and he denied being at the victim's house on the day of the shooting. At the conclusion of the interview, the defendant said the officers would not discover any information that would incriminate him.

¶ 18 Back in the courtroom, Brueggeman testified on cross-examination that he later learned that the individual the defendant referred to as "Smooth" was Damien Jenkins, whom Brueggeman interviewed on January 13, 2011. The only evidence implicating Jenkins was the defendant's statement, and Jenkins gave Brueggeman no indication that he had been at the scene during the murder.

¶ 19 Police verified Jenkins's alibis by checking his phone records and speaking to the people he had been with that night. Police concluded that Jenkins had solid alibis that he was in Belleville on the night of the victim's murder in Centreville. They verified this by speaking with Jenkins's girlfriend, Laura Steele, and her brother, who said that Jenkins was with him at Steele's house playing video games until about 9:30 p.m. and the two of them then went to a bar where Steele worked. They interviewed the bartender, who confirmed that at around 9 or 9:30 p.m., she waited on two men, who Steele identified to her as her brother and her boyfriend. They also interviewed the bar manager, who confirmed that two men visited the bar at around 9:30 p.m., and Steele introduced one of them as her brother. Finally, investigators examined Jenkins's cell phone records, including records of who Jenkins spoke to and the geographic records of cell towers registering "pings" from his cell phone at the relevant times. After investigators verified Jenkins's alibis and examined his phone records, he was dismissed as a suspect.

¶ 20    Sergeant Robert Thomason with the Belleville Police Department testified that he interviewed the defendant on January 12, 2011.  After his first interview, officers learned that the defendant was shot during the victim's murder, so they told the news media they were looking for the defendant, and he came forward.  This interview was also recorded; introduced at trial as People's Exhibits 71-1, 71-2, and 71-3; and played for the jury.

¶ 21    During the defendant's second interview, he revealed for the first time that he went to the victim's house at 8 or 9 p.m. on the night the victim was killed.  The defendant said that earlier in the day, the victim called him about $270 that the defendant owed to the victim.  After he left the Casino Queen, the defendant went to a gas station and called the victim to let him know he was on his way to his house.  When the defendant arrived at the victim's house that night, the victim asked him for the money, but the defendant did not have it with him.

¶ 22    The defendant recalled that the conversation then turned to "Slick," with the defendant expressing his dislike for Slick and his anger with the victim for taking Slick's side in the dispute.  The defendant explained to the police that the victim and Slick had a friendly relationship, but the defendant did not like Slick and did not want him around.

¶ 23    Continuing, the defendant said that when he turned to leave the victim's house to get the victim's money, the victim stood and pulled a gun out of his sweatshirt pocket. When the defendant saw this, he rushed toward the victim, they struggled for the gun in the living room, and the gun went off multiple times.  The defendant said the first or second shot hit him in the lower leg, causing the injury that, earlier in the interview, he said he sustained while playing basketball.  He and the victim struggled down the hallway, and

8

around the time he got shot in the leg, the defendant gained control of the gun, shot the victim one to three times in the struggle for the gun, and felt the victim go weak.

¶ 24   At this point, the defendant knew he had been shot and knew that he had shot the victim, and he limped toward the victim's front door, leaving him on the floor in the hallway. The defendant said that after the shooting and as he was leaving, he saw Slick— who, unbeknownst to him until this moment, had been inside the victim's house the whole time—running out the victim's back door. The defendant said he shot the victim two or three times after he got control of the gun, including perhaps in the stomach; however, he denied shooting the victim after the victim went down, insisting that he only shot the victim during the struggle. The defendant left the gun in the hallway near the victim's body when he fled. In this version of the story, the defendant never mentioned a second gun.

¶ 25   After officers told the defendant that there was another gun involved, he told them a third story, which was that he spoke to the victim about the money he owed, and then they began arguing about Slick. Meanwhile, Slick emerged from the rear of the victim's house before the shooting, not after the shooting. The defendant saw Slick for the first time when he was telling the victim how he felt about Slick. The defendant told the victim that it was "bullshit" for him to not have alerted the defendant that Slick was there. When the defendant rose to leave, shots were fired, and Slick ran out the back door at that time. The defendant said the only details he omitted from his prior story were that he saw Slick emerge, that he spoke with Slick briefly, and that Slick ran out the victim's back door after the victim shot the defendant in the leg. Other than that, he said the shooting involved one gun and occurred as previously described.

9

¶ 26    After officers again said there was another gun involved, the defendant told them a fourth story.  In it, he admitted for the first time that he arrived at the victim's home armed with a 9-millimeter gun that he always carried.  After the defendant saw Slick emerge and the victim reached for his gun, the defendant pulled out his 9-millimeter gun first and fired the first shot in the living room, and Slick ran out the victim's door after the first shot was fired.  The defendant advanced on the victim and shot him in the back or side as the victim was trying to produce his own gun while retreating down the hallway.  They struggled in the hallway for both guns, with the defendant getting shot in the leg, losing control of his own gun, gaining control of the victim's gun, and possibly shooting the victim one to three more times.  The victim was not moving but said the word "fam," and then the defendant left.  The defendant insisted that he left his gun at the victim's house when he fled.

¶ 27    After the defendant left the victim's house, someone gave him a ride to his mother's house in Cahokia.  On the way to his mother's, the defendant called Tremont and asked Tremont to pick him up so they could talk.  About 10 or 15 minutes after the defendant arrived at his mother's house, Tremont arrived, picked the defendant up, and they drove around for a while.  The defendant expected Tremont to get a call saying that the victim had been shot, so he struggled with whether to tell Tremont what happened.  Tremont eventually did get a call, and it sounded to the defendant like Tremont intended to drive to the victim's house.  Tremont then drove the defendant to his daughter's mother's house in Caseyville.  About 15 or 20 minutes later, his brother picked him up and took him back to his mother's house.  While the defendant was with his brother, Cassandra called to tell the defendant's brother that the victim had been shot.

10

¶ 28    Back at trial, Thomason testified that after the defendant finished his statement, he was taken into custody, and officers drove him to the victim's house for a reenactment. The reenactment, in which he repeated his fourth account of the shooting, was introduced at trial as People's Exhibit 72.

¶ 29    On the video of the reenactment, the defendant was in the victim's house when he said he believed that Slick emerged when he told the victim that he did not come over to hear about Slick and that he was going to leave. The defendant felt defensive because Slick had been present to hear everything the defendant said about him. The defendant said that he told the victim, "this some bullshit," and the victim was walking from behind the couch while the defendant moved towards the door; the victim had his hands in the pocket of his sweatshirt. The victim seemed like he was trying to retrieve his gun, so the defendant took his own gun out and shot first, prompting Slick to flee out the back door. The victim turned around, and the defendant followed him; there was a tussle near the wall, and a second shot was fired. The two of them rounded the corner and started down the hallway; the defendant grabbed the victim and tried to get his gun. The defendant thought he was shot somewhere in the hallway, whereupon he lost his gun and gained control of the victim's gun. The defendant told the officers that the victim was lying on the floor at the end of the hallway when he said, "fam." He said he left both guns in the house when he fled.

¶ 30    Tremont testified as a witness for the State. He testified that after he had some gun-related convictions between 2000 and 2004, he was baptized and became deeply involved in church. Although he was close with the defendant and the victim before he changed his life, his involvement with them at the time of the victim's death mainly consisted of praying

11

for them and inviting them to church or bible study. Tremont testified that between 8:30 and 9:30 p.m. on January 7, 2011, the defendant called him and asked him to come to the defendant's mother's home in Cahokia, and that a mutual friend, Pierre, drove him there.

¶ 31 Tremont entered the home and chatted with the defendant's family until the defendant emerged from the back room and rushed him out of the home, saying he needed to talk to Tremont. They walked to the car, and the defendant asked Tremont to drive. The defendant turned up the car stereo and motioned for Tremont to come closer. Tremont leaned over, and the defendant said, "I tripped, I tripped, don't be upset with me, I tripped." Tremont asked what he meant, and the defendant said, "I shot G." The defendant asked Tremont not to be mad. When Tremont asked if the victim was dead, the defendant nodded and mouthed "yes."

¶ 32 Tremont testified that the defendant said that he had to do it. Pointing to his leg, the defendant said he had been shot. Tremont asked if the defendant wanted to go to the hospital, but he said no. Tremont asked where he wanted to go, and the defendant said he would go wherever Tremont was going. The defendant, who was holding a bag in his hand, said he had two "burners" or "mags" or "units" on him, which are slang terms for guns. Tremont worried that the defendant might kill him, so he decided to drive the defendant to the home of his daughter's mother, Hattie Williams, in Caseyville. On the way, the defendant asked Tremont to not let "the streets" kill him and said that if he was going to be killed, he preferred Tremont to kill him. Tremont said he was not going to kill the defendant; instead, Tremont offered to pray for him. Tremont said that when they prayed, the defendant "started to yell out, like just yell out, like yell, just yell and cry and

12

yell." They arrived at Williams's home around 10:15 or 10:30 p.m., the defendant went inside, and Tremont drove to the victim's home, arriving around 10:30 or 10:45 p.m.

¶ 33     As Tremont was driving the defendant to Caseyville, Tremont's phone was ringing. Tremont testified it was his brother, Patrick, and their mother, Cassandra, who had been calling to tell him that the victim had been shot. Tremont told Patrick to call the police and to meet him at the victim's house, and Tremont drove himself and Pierre to the victim's house.[2] No police officers were present when Tremont and Pierre arrived. Tremont entered the victim's house through the back door, which was closed but unlocked, looked down the hallway, and saw the victim apparently dead on the hallway floor. Tremont did not want to be the one to call the police, so he called Patrick and told him to call the police again and tell them that "shots had been fired at that home and they needed to send *** police." Tremont and Pierre retreated to the corner and watched as police arrived and shone a flashlight on the house, but after they did not go inside, Tremont called Patrick back and told him to call the police again and to say that someone was running from the house and to send someone else out. This was false. Tremont said Cassandra and two other people called the police, including the East St. Louis police because the Centreville police did not enter the victim's home, and this explained the multiple 9-1-1 calls. Tremont testified that he did not touch anything or see any guns inside the house.

¶ 34     Tremont did not immediately come forward with the information the defendant told him because he was fearful for his life and for his family. One or two days after the murder,

_____

[2]Corroborating Tremont's testimony about the calls to police, Thomason testified that he interviewed Patrick because he made the original 9-1-1 call reporting shots fired in the area.

13

the defendant called Tremont and said he was going to make things right. Tremont initially gave a statement to police that did not incriminate the defendant, because he was still afraid, and he wanted to let the defendant turn himself in. He felt like he had been pulled back into a life he was trying to leave behind, and two people he loved were involved in it. On January 13, 2011, Tremont went back to the police station to tell the truth, because "God had been weighing on [him] heavy," and the defendant still had not turned himself in.

¶ 35    On cross-examination, Tremont acknowledged that he had told police in his first statement that he had not entered the victim's house. He said that because had he told police he entered the home, he felt he would have had to incriminate the defendant, because the defendant was how Tremont knew the victim had been shot. He acknowledged that he had never actually seen any guns with the defendant on the night of the shooting.

¶ 36    The State rested, and a motion for directed verdict was denied.

¶ 37    The defendant testified in his own defense at trial. He had been friends with the victim for 20 to 23 years. The defendant's brother was an artist for a record label that the victim started. The defendant, the victim, and Jenkins were all "G.D."

¶ 38    The defendant testified that he started selling cannabis for the victim in 2010, and by the end of that year, he was selling more than $10,000 in cannabis per week. By the end of 2010, the defendant had saved about $60,000. Around January 4, 2011, the victim told the defendant that he could buy the cannabis directly from the victim's dealer for the same price the victim got it for. This made the defendant a little nervous, but he trusted the victim, so he gave the victim the $60,000 on a Tuesday, and the victim said he expected

14

the cannabis shipment the following Sunday night or Monday morning. The defendant had not mentioned this transaction during any of his prior interviews.

¶ 39    The defendant testified that on January 7, 2011, he and his brother were at the recording studio from 11 a.m. to 3 or 4 p.m. During their recording session, the victim called multiple times to ask how the recording was going and whether the defendant would come over after the session and bring a CD with him. The defendant went to his mother's house in Cahokia and then to the Casino Queen to drink with friends; the victim called him again, and the defendant said he would have someone drop him off at the victim's house.

¶ 40    The victim had given the defendant a 9-millimeter a few weeks before, and while he usually kept it the victim's house, he had taken it to his mother's house recently; thus, he decided to use this occasion to take the gun back to the victim, carrying it in the waist of his pants. According to the defendant, the gun only had two bullets in it. The defendant went into the victim's house and handed the CD to the victim. The defendant went to the bathroom, and when he came back, he sat on the couch whereupon they smoked and talked about the CD.

¶ 41    The defendant then repeated the story about discussing the $270 he owed to the victim. The conversation was hampered by his initial confusion over whether the victim was talking about the $60,000 the defendant had given the victim a couple days before. The victim told the defendant, "that's messed up when somebody owe you money and they act like they don't know it"; the defendant agreed, but he still did not realize that the victim was talking about him. The victim became increasingly agitated and aggressive over the

15

$270 debt. The victim stood and began pacing back and forth with his hands in his sweatshirt pocket.

¶ 42 The defendant testified about talking to the victim about Jenkins, with the defendant expressing his dislike for Jenkins and with the victim taking Jenkins's side, and then unexpectedly seeing Jenkins emerge from the rear of the victim's home. The defendant thought Jenkins heard what the defendant said about him. The defendant believed they were going to kill him, and he told the victim, "this some bullshit." The defendant spoke with Jenkins, saw the victim reaching for a gun, pulled his own gun out first, fired two shots at the victim in the living room while advancing toward him, and saw Jenkins run out the back door. He "rushed" the victim, dropped his own gun, and struggled for the victim's gun. As the struggle continued into the hallway, the defendant was shot in the leg, heard the victim's gun go off, and felt the victim go weak. In contradiction to his prior statement to police, the defendant denied shooting the victim in the back; he also denied shooting the victim in the back of the head. In another contradiction of this prior statement to police, he denied gaining control of the victim's gun.

¶ 43 When the defendant saw both guns lying on the ground, he fled out the front door. The defendant heard the victim say "fam" before he left. He then ran to a gas station and had a friend take him to his mother's house in Cahokia. He used the friend's phone to call Tremont. The defendant wanted to explain to Tremont what happened. Tremont picked the defendant up at his mother's house; the defendant testified that he had a bag full of the clothes he had been wearing, but he did not have any guns because he left them at the victim's house.

16

¶ 44    The defendant testified that he did not tell Tremont that the victim was dead because he did not believe the victim was dead; he did not believe that any of the shots he fired would have killed the victim. He told Tremont something happened at the victim's house and might have told him that he himself had gotten shot, but the defendant denied telling Tremont that he shot the victim. The defendant said he did not find out that the victim was dead until late morning of January 8.

¶ 45    The defendant testified that he did not tell the police the truth initially because as a felon, he was not supposed to have the 9-millimeter gun, and he did not want police to know about the cannabis operation. The defendant also felt like he must be responsible for the victim's death, but this was before he knew about the shots to the victim's back and to the back of the victim's head. However, once he learned about those shots and where the victim's body had been found, the defendant decided he was not the one who killed the victim, because nothing during their fight could have inflicted wounds to the back of the head, and because they never reached that part of the hallway during their tussle. He also only had two bullets in his 9-millimeter handgun and could not have shot the victim with it multiple times. The defendant did not want to implicate Jenkins during his initial contact with the police because he did not want Jenkins to retaliate against him.

¶ 46    On cross-examination, the defendant admitted to changing his story during his multiple interviews and trial testimony. He denied that the victim fled down the hallway during the fight. He acknowledged pulling his gun and firing first, and then he agreed that he moved away from the front door towards the hallway to follow the victim. He did not remember telling the police that he shot the victim in the back, though he admitted it was

17

possible he said that. He pulled out his gun first because he believed the victim was about to pull out his own gun. The defendant did not believe he killed the victim. When asked whether he left the victim to die, the defendant responded that he "probably left him how he would have left me if I didn't have that gun on me."

¶ 47    In closing argument, the State reiterated that the defendant told a variety of stories to police and noted that he changed his story about whether he shot the victim in the back. The State argued that police investigated Jenkins and determined that Jenkins was not at the victim's home on the night of the shooting. The State argued that either the defendant came to the victim's home armed with both guns and shot and killed the victim with both guns, or else, as the defendant had told police, the defendant fired multiple shots at the victim with his 9-millimeter gun, gained control of the victim's .45-caliber gun, and shot him one or three more times. The State argued that the defendant did not shoot the victim in self-defense because a reasonable person could have left through the front door if he felt threatened; because he admitted to retrieving his gun first and shooting first while following the victim as the victim retreated down the hall; and because, even if the victim had a gun, the defendant gained control of it, leaving the victim unarmed, and then he put the final bullet in the back of the victim's head.

¶ 48    Defense counsel argued that, because police responded to the first "shots fired" call and arrived at the victim's house at 10:30 p.m., and because the victim's death certificate listed his time of injury as 10:08 p.m., someone else must have entered the victim's home at that time and shot the victim in the head after the defendant, a couple of hours before, shot the victim nonfatally and in self-defense. Defense counsel asserted that the defendant

18

shot the victim between 8 and 8:30 p.m., that he called Tremont for a ride at 8:30 p.m., and that he was with his mother, Tremont, or Williams after that time, so he could not have been the one who fired the fatal shots around 10 p.m. Defense counsel theorized that the victim and Jenkins had plotted to kill the defendant to keep his $60,000 in cash or cannabis, and that after the defendant shot the victim, Jenkins killed the victim and stole the money. Defense counsel also questioned the thoroughness of the investigation, including Jenkins's alibi and the failure to test a long hair found on the victim's body.

¶ 49    In rebuttal, the State argued police established Jenkins's alibi by interviewing four people and examining the geographic location of his cell phone, and that he was not at the victim's home. The State reminded the jury that the defendant told Tremont that he had two guns, that he had shot the victim, and that the victim was dead; reminded the jury that the defendant admitted shooting the victim in the back, which was a fatal shot; argued that the defendant, who lived with his mother, never had $60,000; and reminded the jury that the victim sustained a defensive wound. The State argued that no one planned to ambush the defendant, who, as the initial aggressor, drew first and shot first.

¶ 50    At the jury instruction conference, defense counsel told the trial court that it had recommended to the defendant the option of having the jury instructed as to lesser-included offenses; however, the defendant wanted to take his chances with all-or-nothing first degree murder instructions. Asked by the court whether this was his wish, the defendant answered in the affirmative. The State then sought to clarify whether the defense's position was that the defendant could be found not guilty either if the jury did not believe he committed the

19

acts causing death or if the jury believed he was justified in using the force he used. The defendant and his counsel agreed that was their position.

¶ 51 The jury was instructed that to find the defendant guilty of first degree murder, it was required to find his use of force was not legally justified. The jury was further instructed as to when the use of force is justified, when the use of deadly force is justified, and when the use of force by an initial aggressor is justified.

¶ 52 The jury found the defendant guilty of first degree murder and that he personally discharged a firearm, proximately causing the victim's great bodily harm, permanent disability, permanent disfigurement, or death. On December 11, 2012, the trial court sentenced the defendant to 20 years' imprisonment as to first degree murder and 25 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of mandatory supervised release.

¶ 53 The defendant filed a direct appeal, solely arguing that he was entitled to credit for two additional days of presentence incarceration. The State conceded the point, and this court granted the defendant's request to amend the mittimus to reflect the additional presentence incarceration credit in *People v. Northington*, No. 5-13-0035 (2014) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 54                     B. The Defendant's Postconviction Proceedings

¶ 55 In March 2013, while the defendant's direct appeal was pending, ASA Christ died of a drug overdose at Judge Cook's hunting cabin. In May 2013, Judge Cook was indicted in federal court on drug and gun charges, to which he pled guilty and was sentenced to a term of imprisonment.

20

¶ 56    On March 12, 2015, the defendant filed a *pro se* petition for postconviction relief, asserting two claims relating to Judge Cook and ASA Christ, one claim of ineffective assistance of trial counsel, and one claim of ineffective assistance of appellate counsel.[3]

¶ 57    Postconviction counsel was appointed, the petition advanced to second-stage proceedings, and an amended motion was filed.  Postconviction counsel filed a certificate of compliance with Illinois Supreme Court Rule 651(c) (eff. Feb. 6, 2013).

¶ 58    The State moved to dismiss the amended petition.  After a hearing, the trial court dismissed the Cook/Christ claims, finding that there was no evidence to support them and no showing that the trial's outcome would have been different if a different judge had presided.  The court denied the motion to dismiss the ineffective-assistance-of-counsel claims, which were advanced to a third-stage evidentiary hearing.

¶ 59    The defendant and Lloyd Cueto, who served as the defendant's lead trial counsel, both testified at the evidentiary hearing.  The defendant testified that during and after his trial, he thought Cueto did a "great job" representing him.  The defendant believed that Cueto listened to him when they discussed issues with the case and that Cueto answered any questions that the defendant had.  The defendant asserted that he shot the victim nonfatally around 8 p.m., and that he believed Jenkins entered the victim's home and fired the fatal shots around 10 p.m.  The defendant stated that timeline was supported by the 9-1-1 call being received around 10 p.m. and the death certificate listing the victim's "time of injury" as 10:08 p.m.  He said Cueto should have called Tremont, his mother, and Hattie

---

[3]To avoid unnecessary repetition, we will recite the defendant's specific postconviction claims as needed for our discussion in section II below.

21

Williams as witnesses to corroborate his testimony that he was not at the victim's home around 10 p.m., but that when they discussed these witnesses, Cueto said it would be best if they did not testify.

¶ 60    On cross-examination, the defendant acknowledged that his basis for saying the fatal injuries occurred at 10:08 p.m. was the death certificate.  He denied telling officers that he followed the victim down the hallway of the house or that anything happened after they turned the corner down the hallway.  He testified that the victim "never turned around and started running or anything."

¶ 61    The defendant also acknowledged that Cueto had elicited testimony that Tremont had given inconsistent statements, and that Cueto asked police officers several questions about how hard they investigated Jenkins as a suspect.  The defendant admitted that Tremont said the defendant admitted to killing the victim.  The defendant insisted that he did not ask for self-defense, "because [he] wasn't fixin [*sic*] to admit to something [he] didn't do."  On redirect examination, the defendant said his defense was not self-defense but alibi, and no alibi witnesses testified on his behalf.

¶ 62    Cueto testified that the defendant told police that he shot the victim in self-defense, he wanted to assert self-defense, he had not raised the idea of an alibi defense, he did not ask Cueto to interview any specific witnesses, and Cueto had not believed that interviewing any witnesses would be helpful to the defense.  Cueto testified that the defendant had admitted shooting the victim but not killing him, and that his trial strategy was to argue to the jury that there was reasonable doubt about whether Jenkins or someone else had come back and fired the fatal shots.  Jenkins and Tremont were the two main people the defense

22

sought to cast suspicion on, even though Jenkins had an alibi. Tremont's statements were inconsistent, and Jenkins was mentioned multiple times as a suspect. Cueto said they did not want to call Jenkins, because it was better just to argue that the police had been sloppy in their investigations by not following up with him.

¶ 63    During cross-examination, Cueto said he remembered a self-defense instruction being given. On the other hand, he did not recall having any discussions about an alibi defense. Cueto did not ask for any fingerprints to be processed from the back door, because Tremont, Jenkins, and the empty chair were the people the defense was trying to blame.

¶ 64    On March 27, 2017, the trial court denied the postconviction petition. The court found that the defendant admitted to shooting the victim and that the State had presented evidence that the defendant told Tremont that he killed the victim. The court further found that Cueto had argued self-defense at trial and put that to the jury with proper instructions. "[G]iven the evidence available, the 'self-defense' defense was more viable than an 'alibi' defense," so the court concluded that Cueto was not ineffective. The defendant appeals.

¶ 65                                        II. ANALYSIS

¶ 66    On appeal, the defendant does not argue the merits of his postconviction claims and, as a result, has forfeited any argument that they were meritorious. *People v. Cotto*, 2016 IL 119006, ¶ 49; *People v. Bass*, 2018 IL App (1st) 152650, ¶ 10; Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) (points not raised on appeal are forfeited). Consequently, the defendant rests his claim for relief solely on his contention that his postconviction counsel failed to comply with Rule 651(c).

23

¶ 67    The Act (725 ILCS 5/122-1 *et seq.* (West 2014)) provides a collateral means for a defendant to challenge a conviction or sentence for a substantial violation of a federal or state constitutional right. *People v. Bailey*, 2017 IL 121450, ¶ 17. The Act establishes a three-stage process for adjudicating a postconviction petition. *Id.* ¶ 18. At the first stage of the postconviction proceedings, the trial court must determine, without any input from the State, whether defendant's petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2014). If the petition is not dismissed at the first stage, the petition must be docketed for further consideration. 725 ILCS 5/122-2.1(b) (West 2014).

¶ 68    At the second stage, the trial court must determine whether defendant is indigent and, if so, whether he wishes to have counsel appointed to represent him. *Id.* § 122-4. After an appointment, Illinois Supreme Court Rule 651(c) requires counsel (1) to consult with defendant by mail or in person to ascertain his contentions of deprivation of constitutional rights, (2) to examine the record of the proceedings at the trial, and (3) to make any amendments that are necessary to the petition previously filed by the *pro se* defendant. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013).

¶ 69    After appointed counsel has made any necessary amendments to the petition, the State may file a motion to dismiss it. 725 ILCS 5/122-5 (West 2014); *People v. Kirkpatrick*, 2012 IL App (2d) 100898, ¶ 13. At the second stage, the trial court determines whether defendant has made a substantial showing of a constitutional violation, and if a substantial showing is made, the petition proceeds to the third stage for an evidentiary hearing; if no substantial showing is made, the petition is dismissed. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

24

¶ 70 At the third stage of a postconviction proceeding, the defendant retains the burden of showing a substantial deprivation of federal or state constitutional rights. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). The trial court's decision at the third stage will not be reversed unless it was manifestly erroneous. *Id.*

¶ 71 Although, as stated above, the Act provides for the appointment of counsel at an indigent petitioner's request when a petition reaches the second stage of proceedings (725 ILCS 5/122-4 (West 2014)), defendant does not have a constitutional right to effective assistance of counsel at a postconviction proceeding. *People v. Moore*, 189 Ill. 2d 521, 541 (2000). Instead, the Act provides a statutory right to "a reasonable level of assistance by appointed counsel." *Id.* One aspect of reasonable assistance is substantial compliance with Rule 651(c). *People v. Mason*, 2016 IL App (4th) 140517, ¶ 19. Compliance with Rule 651(c) may be shown by the filing of a certificate of counsel. Ill. S. Ct. R. 651(c) (eff. Feb. 6, 2013). The filing of a facially valid Rule 651(c) certificate creates a rebuttable presumption that counsel acted reasonably and complied with the rule. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. We review counsel's compliance with Rule 651(c) *de novo*. *Bass*, 2018 IL App (1st) 152650, ¶ 13.

¶ 72 Here, postconviction counsel filed a Rule 651(c) certificate indicating that he and his associate examined the entire record of the trial proceedings; "made any amendments to the Amended Petition for Post-Conviction Relief, filed *pro se* that are necessary for adequate presentation of Defendant's contentions"; consulted with the defendant by correspondence to him on seven different occasions to ascertain his contentions as to the deprivation of his constitutional rights; "received and reviewed correspondence from

25

Defendant dated 10/19/15, 4/25/16, 6/24/16, 8/22/16 and various other letters that were undated to ascertain his contentions of deprivation of constitutional rights"; and personally met with the defendant on three different occasions to ascertain his contentions. The defendant has not raised any issues with the validity of the certificate filed by counsel. Accordingly, there is a rebuttable presumption that postconviction counsel acted reasonably and, in order to overcome this presumption, the defendant bears the burden of "demonstrating his attorney's failure to substantially comply with the duties mandated by Rule 651(c)." *Profit*, 2012 IL App (1st) 101307, ¶ 19.

¶ 73        A. Whether Postconviction Counsel Failed to Fully Examine the Record

¶ 74    The defendant first argues that his postconviction counsel failed to comply with Rule 651(c) because he failed to fully examine the record. As evidence of his counsel's alleged failure, the defendant points to an allegation that postconviction counsel included in the amended petition as to the Cook/Christ claims and statements postconviction counsel made during the second-stage motion to dismiss hearing. For the reasons set forth below, we find that the defendant has failed to rebut the presumption that his postconviction counsel complied with Rule 651(c).

¶ 75    Two of the claims raised in the defendant's *pro se* postconviction petition were that (1) "he was denied the right to fair trial where, during the time of his trial, his judge has [*sic*] been formally charged with the commission of a crime which involves moral turpitude and reflected adversely upon the judges [*sic*] fitness to serve," and where there was a conflict of interest created by Judge Cook and ASA Christ's "relationship and improprieties"; and (2) the defendant was denied due process because the State knew that

26

Judge Cook was under federal investigation at the time of trial and failed to disclose that information. Postconviction counsel subsequently filed the amended petition, which realleged the Cook/Christ claims as follows: (1) the defendant was denied due process and equal protection when, (A) the State failed to disclose investigations of Judge Cook; (B) the State "failed to disclose information which could have allowed the [defendant] to take action to ensure that he was afforded a fair trial"; (C) the State's "failure to disclose its knowledge of the investigation of Judge Cook" violated *Brady v. Maryland*, 373 U.S. 83 (1963); (D) Judge Cook pleaded guilty to possession of heroin and unlawful use of controlled substance while in possession of a firearm, and admitted to being a heroin addict; and (E) "Judge Cook's heroin addiction clearly impaired his judgment and could have caused him to impose an unfair, excessive sentence, based upon improper, prejudicial evidence and information." The amended petition also claimed that Judge Cook and ASA Christ's extracurricular relationship resulted in a personal bias in favor of the prosecution and against the defendant.

¶ 76 The defendant takes issue with the allegation in the amended postconviction petition relating to the possibility that Judge Cook's heroin use impaired his judgment and could have caused him to impose an unfair and excessive sentence. He argues that because he was sentenced to the minimum possible sentence, the fact that postconviction counsel alleged Judge Cook's heroin addiction could have caused him to impose an unfair and excessive sentence proves that postconviction counsel failed to fully examine the record. We disagree.

27

¶ 77    Substantial compliance with Rule 651(c) does not require that appointed postconviction counsel examine the entirety of a defendant's trial proceedings. *People v. Davis*, 156 Ill. 2d 149, 161-64 (1993).  Instead, appointed counsel is only required to examine as much of the transcript as is necessary to adequately present and support the constitutional claims raised in defendant's *pro se* postconviction petition. *Id*.  In this case, the defendant's *pro se* postconviction petition did not allege any specific constitutional violations based on the defendant's sentence.

¶ 78    Further, the defendant's postconviction counsel certified that he and his associate examined the entire record of the trial proceedings.  In his appellate brief, the defendant himself has acknowledged that his trial counsel argued the court should impose a 15-year firearm sentencing enhancement rather than the 25-year enhancement asserted by the State.  This could have been the issue that postconviction counsel intended to raise with the complained-of allegation.   Though the allegation may not have been particularly compelling, the Act only requires reasonable performance, a standard that is significantly lower than the standard mandated at trial by our state and federal constitutions.  *People v. Custer*, 2019 IL 123339, ¶ 32.

¶ 79    Moreover, we must review postconviction counsel's performance as a whole; "we do not view isolated incidents in a vacuum." *People v. Miller*, 2017 IL App (3d) 140977, ¶ 48.  As such, we conclude that this isolated allegation was insufficient to rebut the presumption that postconviction counsel complied with Rule 651(c).  We also find that it in no way resulted in the dismissal of the Cook/Christ claims, as the trial court stated it dismissed them because it found there was no evidence to support them and no showing

28

that the trial's outcome would have been different if a different judge had presided. It is the defendant's burden to overcome the presumption that his postconviction counsel's assistance was reasonable, and he has failed to do so.

¶ 80 Next, the defendant argues that postconviction counsel's statements during the second-stage motion to dismiss hearing on his ineffective-assistance-of-counsel claims prove that counsel did not fully examine the record. We disagree.

¶ 81 During the hearing on the State's motion to dismiss the defendant's amended postconviction petition, ASA Dalan recalled that the defendant's defense at trial "was that he did fire in self-defense the multiple—most of the bullets that the victim received, but not the one to the back of the head, and that someone else must have come in the house and fired that final shot." In response, postconviction counsel stated that:

> "my client has asked me to respond to one of Ms. Dalan's arguments about a potential self defense argument. I don't know that Ms. Dalan said that, but we want the record to be clear that we never offered—the lawyers never offered a self defense instruction or anything. It was an all or nothing on murder, murder one. So I hope that clears that record."

¶ 82 We find this statement does not demonstrate that postconviction counsel failed to comply with Rule 651(c) by fully examining the record when the statement itself reveals that it was procured by the defendant. See *People v. Schaefer*, 217 Ill. App. 3d 666, 670 (1991) (defendant cannot complain about errors he invited). Although the record indicates that a self-defense instruction was given to the jury, and the defendant and his trial counsel agreed to this, ASA Dalan was the one who offered that instruction. Accordingly, the statement the defendant now complains of is not entirely inaccurate.

29

¶ 83    We also find postconviction counsel's confusion as to whether self-defense was presented at trial not unreasonable in light of the defendant's everchanging explanation of what happened on the night of the victim's murder.  The record reveals that the defendant first claimed he was not present on the night of the murder but later contended that he shot and killed the victim in self-defense.  The defendant's story changed again during his trial testimony in which he claimed he shot the victim in self-defense but not did kill him, and that he was not at the victim's house at the time that he believed the victim was later killed.  Furthermore, the trial court dismissed the defendant's ineffective-assistance-of-counsel claims based on this statement.  After the court advanced those claims to a third-stage evidentiary hearing and heard the defendant's and Cueto's testimony on the issue, the court denied them on the merits.  Thus, viewing the record as a whole, we conclude that this isolated statement was not sufficient to rebut the presumption that postconviction counsel's performance substantially complied with Rule 651(c).

¶ 84    B. Whether Postconviction Counsel Failed to Amend the Petition to Adequately
Present the Defendant's Claims

¶ 85    The defendant also argues that his postconviction counsel was unreasonable for failing to amend his petition to adequately present his claims.  In order to provide context for his first argument as to this requirement, we find it necessary to restate the entirety of the defendant's relevant *pro se* claim:

> "Petitioner was denied his rights to the effective assistance of trial lawyer where trial lawyer failed to investigate an issue (pg. 385 trial transcript).  The State['s] star witness (Mr. Tremont Davis) stated that during the time he was dropping me off at my daughter's mother's house, he was receiving calls from his younger brother (Patrick Davis) and his mother (Cassandra Davis) letting him know that the victim, who is also Tremont's uncle, has been shot.  What I don't understand

30

is how did Patrick and Cassandra know about the victim had been shot. The State claims that I was the only one in the house with the victim. The only one I talked to about this incident was Tremont. Tremont could not have told them about it because they was [*sic*] calling to tell him about it. Patrick and Cassandra never stated they went into the house, so it would be impossible for them to know the victim was shot unless somebody else went in the house and called them. But who ?? [*sic*] My theory was that somebody else went in that house and killed Ramone Cole.

I believe if my lawyer would have interviewed Patrick and Cassandra Davis and tried to find out how did they learned [*sic*] the victim was shot, it would have advanced my theory that somebody else went in that house after I left and killed him, also it could have changed the outcome of my trial."

Attached to his *pro se* petition, the defendant included an affidavit attesting to his inability to obtains affidavits from Patrick and Cassandra Davis.

¶ 86    In the amended petition, postconviction counsel alleged that the defendant was denied effective assistance of trial counsel for failing "to investigate and call additional witnesses who would have provided testimony to exonerate" the defendant. During the subsequent second-stage motion to dismiss hearing, Patrick and Cassandra Davis's names were brought up as potential witnesses that the defendant believed trial counsel should have called to testify, as well as Damien Jenkins. On appeal, the defendant argues postconviction counsel failed to comply with Rule 651(c) because he did not identify specific witnesses; state whether they would testify, what their testimony would have been, and how it would have helped his case; or include evidentiary affidavits to support this claim. In our view, the defendant's argument begs the question since he presumes (without any support in the record) that postconviction counsel's failure to include such information in the amended petition or to attach additional affidavits was the result of some deficiency in counsel's performance rather than an inability to substantiate the defendant's claims.

31

¶ 87    We "may reasonably presume that post[ ]conviction counsel made a concerted effort to obtain affidavits in support of the post[ ]conviction claims, but was unable to do so" unless that presumption is rebutted by the record. *People v. Johnson*, 154 Ill. 2d 227, 241 (1993); see also *People v. Malone*, 2017 IL App (3d) 140165, ¶ 10 (without a showing that there was material available for supporting affidavits, the failure to attach affidavits will not be considered unreasonable performance). In this case, we find no evidence in the record to rebut the presumption that counsel attempted to obtain the necessary affidavits. The record reveals that postconviction counsel certified that he and his associate corresponded with the defendant to ascertain his claims of constitutional deprivations and then made the necessary amendments to adequately present them. The amended petition also alleged that no additional affidavits were attached due to the nature of the claims raised therein. The defendant is unsatisfied with postconviction counsel's explanation as to why no affidavits were attached to the amended petition and argues that it offered "no explanation at all." Notably, however, the defendant cites no authority to support his claim that this explanation was unreasonable, and we find that postconviction counsel substantially complied with the Act and Rule 651(c) by including in the amended petition the explanation for the absence of affidavits.

¶ 88    Furthermore, the trial court did not dismiss the defendant's ineffective-assistance-of-counsel claims based on the absence of affidavits or the failure to identify specific witnesses in the amended petition. In fact, the court advanced those claims to a third-stage evidentiary hearing and denied them after hearing the defendant and Cueto's testimony. Counsel may have amended the defendant's claims to adequately present them for review,

but not every postconviction petition can be amended to state a successful constitutional claim. See *Bass*, 2018 IL App (1st) 152650, ¶ 16 (similarly finding).

¶ 89 The defendant also complains of the amendments postconviction counsel made with respect to the Cook/Christ claims. He faults his counsel for failing to provide additional specificity or evidentiary support for these claims. However, the defendant has failed to identify what additional details or evidence postconviction counsel could or should have included.

> " '[T]here is no showing of the existence of any facts or evidence on which such affidavits could have been founded. Absent a showing of available material for supporting affidavits, a failure to present affidavits obviously cannot be considered a neglect by the attorney.' *People v. Stovall*, 47 Ill. 2d 42, 46 (1970). Counsel is not required to go on a 'fishing expedition' to find facts and evidence outside the record that might support the defendant's claims." *Malone*, 2017 IL App (3d) 140165, ¶ 10.

¶ 90 Moreover, the record reveals the steps that postconviction counsel took to investigate and present the Cook/Christ claims. Postconviction counsel attempted to subpoena the United States Attorney's office for records relating to the federal investigation into Judge Cook. However, the subpoena was met with a motion to quash and removed to federal court. Thereafter, postconviction counsel withdrew the subpoena. During the motion to dismiss hearing, the trial court stated that it "would be willing to concede that [the defendant's postconviction counsel] expended significant effort with his activity in federal court in attempting to access information about the timing and the extent of the federal investigation." In light of the foregoing, we find the defendant has failed to rebut the presumption that his postconviction counsel complied with Rule 651(c).

¶ 91          C. Postconviction Counsel's Third-Stage Performance

¶ 92     Finally, we address the defendant's claim that his postconviction counsel's conduct during the third-stage evidentiary hearing reveals that he failed to comply with Rule 651(c). It has been determined that Rule 651(c) only applies to counsel at the second stage of postconviction proceedings. *People v. Pabello*, 2019 IL App (2d) 170867, ¶¶ 26-35; *People v. Marshall*, 375 Ill. App. 3d 670, 681-83 (2007). The purpose of Rule 651(c) is to ensure that appointed postconviction counsel consults with defendant to ascertain his claims of constitutional deprivation. *Marshall*, 375 Ill. App. 3d at 683. The requirements of the rule—consulting with defendant, examining the record, and making necessary amendments to the petition to present defendant's claims—are performed by counsel at the second stage of postconviction proceedings so the State can fully review the claims and determine whether to file a motion to dismiss. *Id.* (citing *Pendleton*, 223 Ill. 2d at 472); see also *People v. Bell*, 2014 IL App (3d) 120637, ¶ 14 (finding the requirements of Rule 651(c) apply to the claims raised in the original *pro se* postconviction petition). In contrast, "[t]hird stage counsel does not, as Rule 651(c) requires, examine the record or amend the petition further. Counsel at the third stage of postconviction review argues the merits of the petition as it is presented by second-stage counsel." *Marshall*, 375 Ill. App. 3d at 683.

¶ 93     Here, we have already determined that the defendant's postconviction counsel substantially complied with Rule 651(c) during the second stage of his postconviction proceedings. "Once the petition was advanced to the third stage, Rule 651(c) no longer applied. It would be illogical to measure counsel's performance at the third stage by a standard applicable to a distinctly different second stage." *Pabello*, 2019 IL App (2d)

34

170867, ¶ 28. As such, the defendant's argument that he is entitled to relief because counsel failed to comply with Rule 651(c) during the third-stage evidentiary hearing is without merit.

¶ 94                                    III. CONCLUSION

¶ 95    The judgment of the circuit court of St. Clair County is hereby affirmed.


¶ 96    Affirmed.